LexisNexis(TM) Academic - Document

Page 1 of 9

Home | Sources | Site Map | What's New | Help

Search Terms: 213 F.3d 1206

FOCUS™    Search Within Results    Edit Search

Print  Email

Document List  Expanded List  KWIC  Full    Document 1 of 1.

UNITED STATES OF AMERICA, Plaintiff-Appellant, v. WAYNE HARRISON, Defendant-Appellee.

No. 99-10496

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

213 F.3d 1206; 2000 U.S. App. LEXIS 11898; 2000 Cal. Daily Op. Service 4160; 2000 Daily Journal DAR 5632

April 10, 2000, Argued and Submitted, San Francisco, California
May 30, 2000, Filed

**SUBSEQUENT HISTORY:** [**1] As Amended June 29, 2000.

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of California. D.C. No. CR-95-00319-SI. Susan Y. Illston, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** J. Douglas Wilson, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellant.

Gilbert Eisenberg, San Francisco, California, for the defendant-appellant.

**JUDGES:** Before: A. Wallace Tashima and Susan P. Graber, Circuit Judges, and Robert J. Kelleher, n1 Senior District Judge. Opinion by Judge Kelleher.

n1 The Honorable Robert J. Kelleher, Senior United States District Judge for the Central District of California, sitting by designation.

**OPINION BY:** Robert J. Kelleher

**OPINION:** [*1207] ORDER

Appellant's motion to delete footnote 5 from the opinion is denied, but appellant's alternative motion is granted. Accordingly, the slip opinion filed May 30, 2000, is amended as follows:

On page 5603, first full paragraph, lines 3-4, the phrase "Assistant United States Attorney ("AUSA") David Hall" is deleted and the phrase "the Assistant United States Attorney assigned to prosecute the case (the "AUSA")" is substituted therefor. Also, at the end of said newly-substituted [**2] phrase, a new footnote 2 is added, as follows:

2 The AUSA assigned to prosecute the case is not the same AUSA that represents the government on this appeal.

All subsequent footnotes are renumbered accordingly.

Also on page 5603, first full paragraph, line 6; page 5614, second full paragraph, lines 5 and 7; page 5615, last (carryover) paragraph, lines 1, 3, 5, and 9; and page 5616, carryover footnote 5 (renumbered footnote 6), carryover paragraph, lines 5 and 8, and complete (second) paragraph, lines 2 and 5, substitute "the AUSA" for "AUSA Hall".

EXHIBIT D

http://web.lexis-nexis.com.proxy.lib.utc.edu/universe/document?_m=a73acf0e711f3434d6

AMENDED OPINION

KELLEHER, District Judge:

This interlocutory appeal requires us to examine the doctrinal boundaries of the Sixth Amendment right to counsel. A defendant's right to counsel attaches when the government initiates adversary proceedings by indictment, arraignment, or other means. A criminal defendant is entitled to the assistance of counsel upon invoking the Sixth Amendment right following its attachment. We hold that, in limited and well-defined circumstances, a defendant's ongoing representation by an attorney, although that representation began before indictment, invokes the right to counsel once that right [**3] attaches at the time of indictment.

FACTUAL BACKGROUND

Between June 1994 and January 1996, defendant Wayne Harrison allegedly participated in a large-scale drug ring that sold cocaine and methamphetamine along the west coast of the United States. At some point in early 1995, two members of the ring agreed to inform the government about the ring's activities. The informers' reports led the government to file a complaint against some members of the ring, including its apparent leader, Pierre Rausini.

[*1208] When Rausini learned of the complaint, he concluded that a member of his organization, or a close associate, must have agreed to become a government informant; he fingered Lance Estes, one of the ring's principal customers, as the likely culprit. Seeking to exact retribution, Rausini arranged a meeting with Estes and members of his organization in Orange County, California.

Estes flew to John Wayne Airport in Orange County on August 28, 1995. Harrison picked up Estes at the airport and allegedly drove him to a house in Newport Beach. That evening, Harrison allegedly shot Estes in the head, killing him. Members of the drug ring, possibly including Harrison, then deposited Estes's [**4] body in a dumpster in Oceanside, California.

Oceanside detectives found Estes's body and began investigating the murder. When detectives learned that Harrison had picked up Estes at the airport on the day of the murder, they contacted Harrison to arrange an interview. On September 8, 1995, Harrison met with detectives at the Oceanside Police Department. During the interview, Harrison admitted picking up Estes at John Wayne Airport, but denied any involvement in Estes's murder.

Some months later, a federal grand jury in San Francisco began investigating the drug ring of which Harrison was a member. On October 17, 1996, the grand jury issued a subpoena for Harrison's testimony. In preparation for his grand jury appearance, Harrison hired a lawyer, Julie Traun, to represent him. At his grand jury appearance, Harrison invoked his Fifth Amendment privilege and refused to answer questions. The government then conferred use immunity on Harrison, see 18 U.S.C. §§ 6002, 6003 which Traun helped Harrison obtain. On December 19, 1996, Harrison testified before the grand jury and recounted a version of events consistent with his statement to Oceanside detectives. [**5]

The government contacted Harrison's lawyer, Traun, on two additional occasions after Harrison's two grand jury appearances. On January 9, 1997, the Assistant United States Attorney assigned to prosecute the case (the "AUSA") n2 discussed with Traun the possibility of conducting a polygraph examination of Harrison. In February 1997, Traun and the AUSA discussed possible terms of Harrison's surrender, if the government decided to indict Harrison.

--------------- Footnotes ---------------

n2 The AUSA assigned to prosecute the case is not the same AUSA that represents the government on this appeal.

------------ End Footnotes- ---------------

On October 2, 1997, the grand jury indicted Harrison on charges of conspiring to distribute cocaine and methamphetamine, 21 U.S.C. § 846, and murdering a federal informant, 21 U.S.C. § 848(e)(1)(A), 18 U.S.C. § 1512(a)(1)(C).

On October 9, 1997, several agents from the Federal Bureau of Investigation ("FBI") arrested Harrison at his father's store in Tallahassee, Florida. FBI agents took Harrison [**6] to a local FBI office, where they informed him that he was the subject of a federal arrest warrant from San Francisco. Initially, the FBI agents urged Harrison to cooperate so that his sentence might be mitigated. The agents then formally advised Harrison of his *Miranda* rights, which Harrison waived in a written statement.

Harrison told the FBI agents that, on the night of Estes's murder, he drove Estes from John Wayne Airport to a home in Newport Beach. Harrison acknowledged that he was present in the living room of the home when Estes was murdered in the garage. But Harrison continued to deny any participation in the murder, as well as any knowledge that the murder had been planned in advance. Later in the interview, FBI agents confronted Harrison with several inconsistencies in his story. Harrison then conceded that he had lied in his grand jury testimony, and he admitted that Estes's murder was committed in the kitchen, not the garage, of [*1209] the Newport Beach home. At no time during the FBI interview was Harrison represented by counsel.

On October 17, 1997, Harrison (still in Florida awaiting transfer to San Francisco) initiated a meeting with FBI agents. Harrison again signed [**7] a *Miranda* waiver, telling agents that he wanted to "fill in all the details." Harrison began by denying that he had committed the murder of Estes; then, quite unexpectedly, Harrison terminated the meeting because FBI agents did not produce the "immunity letters" that he requested. n3

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 The record does not disclose the precise nature of the "immunity letters" that Harrison sought. He may have believed that he was still immunized by the terms of his grand jury use immunity deal with the government in December 1996.

- - - - - - - - - - - - End Footnotes - - - - - - - - - - - - - -

PROCEDURAL HISTORY

Before trial, Harrison moved to suppress the statements that he had made to the FBI agents in Florida ("the Florida statements"). The district court granted Harrison's motion and suppressed the Florida statements, "because the government failed to communicate with Harrison after his indictment through his retained counsel in violation of the Sixth Amendment." The court found that the nature of Harrison's pre-indictment contacts with attorney Traun compelled the conclusion [**8] that Traun represented Harrison at the time of the indictment. Because the court found that Traun represented Harrison at the time of the indictment, the court held that Harrison's Florida *Miranda* waivers were invalid. *See Michigan v. Jackson*, 475 U.S. 625, 635, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986) (deeming written waivers "insufficient to justify police-initiated interrogations after the request for counsel" under Sixth Amendment analysis).

JURISDICTION

In criminal cases, the government may appeal pretrial suppression orders entered by a district court. *See* 18 U.S.C. § 3731. The government's right to appeal is subject to three conditions. First, the government may not appeal if the defendant has been put in jeopardy. Second, the appeal must not be taken for purpose of delay. Third, the evidence suppressed must be substantial proof of a material fact in the proceeding. *See id.; United States v. Adrian*, 978 F.2d 486, 489-91 (9th Cir. 1992). Harrison has not been put in jeopardy. The government avers that the appeal is not prosecuted to achieve delay. And Harrison's Florida statements appear facially inconsistent [**9] with portions of his grand jury testimony. We therefore have jurisdiction to hear the government's appeal.

DISCUSSION

The Sixth Amendment guarantees a criminal defendant "the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has held that the Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Kirby*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972) (plurality opinion). But attachment of the right alone does not guarantee a defendant the assistance of counsel. A defendant also must invoke the Sixth Amendment right by hiring a lawyer or asking for appointed counsel. n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Alternatively, a defendant may waive his Sixth Amendment right to counsel and represent himself or herself, so long as the waiver is voluntary, knowing, and intelligent. See *Patterson v. Illinois*, 487 U.S. 285, 292-94, 101 L. Ed. 2d 261, 108 S. Ct. 2389 (1988) (holding that a *Miranda* waiver satisfies this standard); *Faretta v. California*, 422 U.S. 806, 835, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - [**10]

Attachment and invocation are distinct legal events. Cf. *Maine v. Moulton*, 474 U.S. 159, 170, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985) ("Once the right to [*1210] counsel has attached *and* been asserted, the State must of course honor it.") (emphasis added). Further, it appears that, as a general rule, attachment must precede invocation in time. See *McNeil v. Wisconsin*, 501 U.S. 171, 175, 176, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991) ("The Sixth Amendment right . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced . . . .") (citations omitted).

Both sides agree that Harrison's Sixth Amendment right to counsel attached on October 2, 1997, when the federal grand jury in San Francisco indicted him on drug and murder charges. The parties disagree, however, as to when, if at all, Harrison invoked his right to counsel. Harrison asserts that his ongoing attorney-client relationship with Traun "carried over" into the post-indictment phase. That ongoing relationship, Harrison contends, effectively invoked the Sixth Amendment right to counsel following attachment. Harrison therefore [**11] urges us to suppress his Florida statements by invalidating his *Miranda* waivers under the prophylactic rule of *Jackson*. See *Jackson*, 475 U.S. at 635.

The government questions whether Traun's representation of Harrison was truly "ongoing." But the government concentrates its attack on a different front. The government urges us to disregard pre-indictment representation altogether when determining whether a defendant invoked his Sixth Amendment right to counsel. The government notes that Harrison never requested counsel between the time he was indicted and the time of the custodial interrogation in Florida. The government argues that, because Harrison had not expressly invoked his Sixth Amendment right to counsel by the time of the Florida interrogations, he waived his right to the assistance of counsel at those interrogations by executing a *Miranda* waiver. See *Patterson v. Illinois*, 487 U.S. 285, 292-94, 101 L. Ed. 2d 261, 108 S. Ct. 2389 (1988).

In some cases, we have considered pre-indictment activities relevant to the Sixth Amendment analysis. We have held, for example, that "government interference with a defendant's relationship with [**12] his attorney [before indictment] may render counsel's assistance so ineffective as to violate his Sixth Amendment right to counsel." *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980); see also *In re Grand Jury Proceedings*, 33 F.3d 1060, 1062 (9th Cir. 1994) ("The Sixth Amendment can apply when the government's conduct occurs pre-indictment."). But none of our prior opinions has wrestled with the question raised by this appeal.

The government cites three cases from our sister circuits in support of its position: *Chewning v. Rogerson*, 29 F.3d 418 (8th Cir. 1994); *Montoya v. Collins*, 955 F.2d 279 (5th Cir. 1992); *Wilcher v. Hargett*, 978 F.2d 872 (5th Cir. 1992). Each case, however, is factually distinguishable from Harrison's case.

In *Chewning*, the defendant murdered his wife in Iowa, then fled to Utah. After capture in Utah, Chewning was represented by a public defender at an extradition hearing. Chewning did not challenge extradition at the hearing, and Iowa police officers transported Chewning from Utah. During later interviews with Iowa police, Chewning confessed. See *Chewning*, 29 F.3d at 419. [**13] "The essence of Mr. Chewning's argument on appeal is that by having the public defender appear with him at the extradition hearing, he invoked his right to counsel under the sixth amendment, and therefore that all subsequent statements given to police in the absence of counsel were inadmissible." *Id.* at 419-20.

The Eighth Circuit held that extradition hearings are not "critical stages" during which a defendant's Sixth Amendment right to counsel attaches. The court also rejected Chewning's claim that he had established an ongoing legal relationship with the Utah public defender sufficient to establish that the public defender was *his lawyer* for purposes of defending against [*1211] the Iowa murder charge. See *id.* at 421-22.

This last point distinguishes *Chewning* from Harrison's case. Had Chewning demonstrated that the Utah public

defender represented him on the charges raised by the Iowa complaint, Chewning's case would be roughly similar to Harrison's case. In contrast to Chewning, Harrison has shown that Traun dealt with the government on his behalf on four separate occasions before his indictment. Unlike Chewning's single-incident representation [**14] by the Utah public defender, in a non-critical extradition proceeding, Harrison established a relationship with counsel in anticipation of forthcoming charges.

In *Montoya*, counsel was appointed for the defendant at his arraignment, but he said nothing when counsel was appointed. *See Montoya*, 955 F.2d at 282. After arraignment, Montoya waived his rights and made an incriminating statement to police officers. The Fifth Circuit held that Montoya's interrogation did not violate *Jackson* because Montoya never invoked his right to counsel, which would have triggered Sixth Amendment protection. *See id.* at 284-85. "For purposes of *Jackson*, an 'assertion' means some kind of positive statement or *other action* that informs a reasonable person of the defendant's 'desire to deal with the police only through counsel.'" *Id.* at 283 (quoting *Jackson*, 475 U.S. at 626) (emphasis added).

Harrison's execution of the written *Miranda* waiver in the Florida FBI office is ostensibly analogous to Montoya's silence at arraignment, in that neither defendant asserted his Sixth Amendment right to counsel. But the underlying [**15] facts of the two cases differ. Montoya had not previously retained counsel in reference to the charges brought against him, nor had he asked for legal representation at any other juncture. Harrison, in contrast, retained Traun - on his own initiative - to serve as his intermediary with the government as soon as the grand jury subpoenaed him to testify. Harrison's affirmative act of retaining counsel distinguishes his case from Montoya's failure to assert the Sixth Amendment right. Unlike Harrison, Montoya took no other action that could conceivably have been construed to invoke his right to counsel.

In *Wilcher*, the Fifth Circuit refused to suppress the defendant's statements for the reasons outlined in *Montoya*. In particular, the Fifth Circuit held that "Wilcher was unaware that he had been appointed counsel until after he had signed [the incriminating statement in custody]." *Wilcher*, 978 F.2d at 874. As with *Montoya*, *Wilcher* is distinguishable from Harrison's case in that Harrison retained Traun as his counsel before his custodial interrogation. Traun represented Harrison on an ongoing basis at the time of the Florida custodial interrogation. [**16]

The government further argues that the rationale underpinning *McNeil v. Wisconsin* prevents a defendant from invoking the Sixth Amendment right to counsel on the basis of pre-indictment legal representation. In effect, the government argues that pre-indictment representation has no bearing on (post-indictment) invocation. Although we respect the government's attempt to draw lines and establish doctrinal clarity, we disagree that *McNeil* binds us in the circumstances of this case.

In *McNeil*, the Supreme Court acknowledged that *Jackson* prevents custodial interrogation (in the absence of counsel) regarding *charged* crimes when a defendant has previously invoked the right to counsel. *See McNeil*, 501 U.S. at 180; *Jackson*, 475 U.S. at 632-33. But the Court expressed concern that an expansive reading of *Jackson* would prevent police from eliciting uncoerced confessions from defendants pertaining to *uncharged* crimes. The Court stated that "most persons in pretrial custody for serious offenses would be unapproachable by police officers suspecting them of involvement in other crimes, even though they have never expressed any unwillingness [**17] to be questioned." [*1212] *McNeil*, 501 U.S. at 181. The Court characterized attempts to extract uncoerced confessions as an "unmitigated good." *Id.* The Court therefore declined to adopt a broad rule prohibiting all custodial interrogation following indictment.

We agree with the government's assertion that, under *McNeil*, a suspect may not retain counsel before indictment to "preempt" interrogation concerning *any* crime. But *McNeil*'s reach is limited. *McNeil* concerns *only* the class of cases in which police question a defendant in custody about charges unrelated to those prompting the defendant's confinement. Harrison's case is not a member of that class. All the government's questions to Harrison were directed toward the same conduct: the drug ring's activities and the murder of Estes.

Harrison's case is much closer to *Jackson* than to *McNeil*. In *Jackson*, Michigan police questioned the defendants (in two separate cases) following indictment about the very crimes as to which charges had been brought. *See Jackson*, 475 U.S. at 627-28. Because each defendant had invoked his Sixth Amendment right to counsel with respect to his [**18] charges, the Supreme Court ruled that both defendants' custodial *Miranda* waivers were invalid. *See id.* at 635. Harrison, like the *Jackson* defendants, was questioned by FBI agents about the very same acts that gave rise to the charges in his indictment.

Finally, the government points to Supreme Court dictum that, at first blush, appears to foreclose Harrison's argument that an ongoing relationship with counsel may invoke the Sixth Amendment right. In *Moran v.*

*Burbine*, 475 U.S. 412, 430, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986), the Court wrote that "the existence of an attorney-client relationship itself [does not] trigger[] the protections of the Sixth Amendment." Despite the ostensible analogy to Harrison's case, however, that formulation is linked closely to the facts of *Moran* - facts that differ considerably from Harrison's case.

*Moran* is, fundamentally, a Fifth Amendment case. Defendant Burbine was arrested in Cranston, Rhode Island, and taken to the police station for questioning regarding a local burglary. Later that evening, the arresting officer discovered that Burbine fit the description of the perpetrator of an unsolved [**19] murder in Providence. Providence police were notified, and three officers traveled to Cranston to interview Burbine. Independent of the ongoing police activity, Burbine's sister obtained a lawyer from the public defender's office to represent Burbine on the burglary charge. The public defender contacted the Cranston police seeking to represent Burbine during any additional questioning. But the police informed the public defender (falsely) that Burbine would not be questioned further that evening. Providence police in fact continued to question Burbine; they eventually elicited a confession following Burbine's execution of several *Miranda* waivers. Burbine was not under indictment at the time of the Cranston interrogation; the government had not yet commenced any formal adversary judicial proceedings against Burbine concerning the burglary or murder charges.

The Supreme Court first rejected Burbine's Fifth Amendment challenge, holding that "events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Moran*, 475 U.S. at 422. The Court [**20] then discussed Burbine's Sixth Amendment argument.

The Court declined Burbine's invitation to extend the Sixth Amendment right to counsel to pre-indictment interrogations, finding that, "by its very terms, [the right to counsel] becomes applicable only when the government's role shifts from investigation to accusation." *Id.* at 430. The Court described, in [*1213] broad terms, the contours of the protection provided by the Sixth Amendment:

> The suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor . . . . By its very terms, [the right to counsel] becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the "intricacies . . . of law," *ibid.*, is needed to assure that the prosecution's case encounters "the crucible of meaningful adversarial [**21] testing."

*Id.* at 430 (citations omitted).

The Court refused to find that Burbine's attorney-client relationship with the public defender "triggered" his Sixth Amendment right to counsel because police interrogated Burbine *before* indictment. n5 Viewed in context, the *Moran* Court's statement that an attorney-client relationship does not automatically trigger Sixth Amendment protection is limited to pre-indictment attempts to assert the right to counsel.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 The Court's holding is far from novel in this respect. Since *Kirby*, the Court has held consistently that the Sixth Amendment right to counsel attaches once the defendant is indicted - and no sooner. *See United States v. Kirby*, 406 U.S. 682, 689, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972) (plurality opinion); *United States v. Gouveia*, 467 U.S. 180, 187-88, 81 L. Ed. 2d 146, 104 S. Ct. 2292 (1984) ("It has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - [**22]

In *Moran*, the Supreme Court faced a different question than we face in Harrison's case. Burbine brought a Sixth Amendment challenge to his pre-indictment interrogation; Harrison, in contrast, argues that his ongoing relationship with Traun triggered Sixth Amendment protection *after* indictment, when FBI agents interrogated him in Florida. Hence, *Moran* is inapposite because it concerned the Sixth Amendment's effect of an attorney-client relationship on pre-indictment, not post-indictment, interrogation.

We see no reason to ignore a defendant's ongoing representation by counsel merely because that representation began before indictment. A layperson who retains a lawyer on an ongoing basis during a criminal investigation would certainly expect that the lawyer would continue to provide legal assistance if the government later instituted formal charges arising from the focus of that investigation. That layperson would not expect to be required to assert that he or she is represented by counsel once an indictment issues. The layperson would expect the government to know of the ongoing representation based on counsel's prior contacts with the government.

We conclude that, when [**23] there is a close nexus between the focus of a pre-indictment investigation and the ultimate charges brought in the indictment, a defendant's ongoing relationship with counsel that is known (or should be known) by the government invokes the Sixth Amendment right to counsel once that right attaches. Phrased differently, a defendant invokes the Sixth Amendment right to counsel as a matter of law when (1) the defendant retains counsel on an ongoing basis to assist with a pending criminal investigation, (2) the government knows, or should know, that the defendant has ongoing legal representation relating to the subject of that investigation, and (3) the eventual indictment brings charges precisely anticipated by the scope of the pre-indictment investigation.

By adopting this standard, we do not imply that a defendant may invoke the right to counsel before that right attaches. We do suggest, however, that the Sixth [*1214] Amendment right to counsel may be invoked if the record demonstrates an ongoing attorney-client relationship concerning the gravamen of the charges brought in the indictment.

We now apply this standard to Harrison's case.

*A. Did Harrison retain counsel to assist him with* [**24] *a pending criminal investigation?*

The district court found that Traun represented Harrison from the time of his grand jury appearances through his indictment in October 1997. Whether Traun represented Harrison involves a predominately factual determination. Therefore, we review the district court's findings for clear error. *See United States v. Harris*, 738 F.2d 1068, 1071 (9th Cir. 1984).

The district court's determination that Traun represented Harrison on an ongoing basis drew upon four facts: (1) Traun represented Harrison before and during both grand jury appearances; (2) Traun discussed a polygraph exam of Harrison with the AUSA; (3) Traun discussed with the AUSA the possibility of Harrison's surrender in the event of an indictment; and (4) Traun wrote to AUSA Hall *after* Harrison's arrest, stating that "I am Mr. Harrison's attorney."

These facts amply support the district court's finding that Harrison was represented by Traun through October 1997. The grand jury investigation targeted both the drug-related activities of Harrison's ring, as well as the unresolved Estes murder. The government questioned Harrison on all such matters during his grand jury [**25] appearances; Traun represented Harrison with respect to both of these aspects of the investigation. We conclude that the district court did not clearly err in finding that Traun represented Harrison on an ongoing basis when the indictment issued.

*B. Did the government know, or should it have known, that Harrison had ongoing legal representation relating to the investigation?*

If the government could not know that a defendant is represented by counsel, a defendant should not be able to claim the benefit of *Jackson*'s exclusionary rule. *See United States v. Willard*, 919 F.2d 606, 608-09 (9th Cir. 1990). But when the government knows or should know that a defendant is represented by counsel, *Jackson*'s exclusionary rule applies with full force.

In *Willard*, a defendant tried to suppress from use at sentencing certain post-arrest statements made to police officers. Willard had retained counsel before his arrest, but he failed to inform officers, or indeed any government official, of that fact. We determined that Willard had "failed to demonstrate that the officers

knew [he] was represented by counsel at the time of the interrogation." *Willard*, 919 F.2d at 608-09. [**26] Consequently, we refused to suppress Willard's statements.

*Willard* implicitly adopted a "knows, or should have known" test to determine the government's burden in defeating a defendant's *Jackson* claim. A "knows, or should have known" test confers the distinct benefit of an objective, rather than subjective, inquiry. An objective test permits district courts to evaluate what the government should have known. By contrast, a subjective test (requiring that the government actually *know*) would place a more difficult burden on district courts to determine the extent of the government's actual knowledge. The former inquiry is far more easily conducted than the latter. Hence we now make explicit what was left implicit in *Willard*.

The AUSA's conduct reveals not merely that the government should have known that Traun represented Harrison, but also that the government actually knew. The AUSA sought out Traun for the purpose of determining whether a [*1215] polygraph examination might be taken. The AUSA also inquired of Traun whether Harrison would turn himself in peacefully in the event of an indictment. Because the Supreme Court has determined that the knowledge of one government actor [**27] must be imputed to another, the AUSA's contacts with Traun gave the government sufficient notice in advance of the Florida interrogations that Traun represented Harrison. n6 *Cf. Jackson*, 475 U.S. at 634 ("Sixth Amendment principles require that we impute the State's knowledge from one state actor to another . . . . One set of state actors (the police) may not claim ignorance of defendant['s] unequivocal request for counsel to another state actor (the court).").

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 Because the government's conduct in this case greatly disturbs us, we find it worth mentioning that the federal prosecutor may have violated an ethical stricture, as well as a constitutional standard. *See United States v. Lopez*, 4 F.3d 1455, 1458-63 (9th Cir. 1993) (holding that a federal prosecutor in the Northern District of California violated state-law ethical duties by meeting with an indicted defendant without the consent or presence of that defendant's lawyer). Because an attorney (such as the AUSA) generally may not permit his agents (such as the FBI agents) to perform acts that the attorney could not perform himself, *see* Cal. R. Prof. Cond. 1-120 (West 1996), the AUSA may have violated his ethical obligations by permitting the Florida interrogations to go forward. *See United States v. Ortega*, 203 F.3d 675, 680-81 (9th Cir. 2000) (deploring, on ethical grounds, the fact that the government, via INS agents, routinely questions represented clients after indictment outside the presence and without the consent of counsel).

We decline to rest our decision on this ground for two reasons. First, the AUSA's involvement in the Florida interrogation is not fully explained in the record. It is possible that he did not know that FBI agents would proceed to interrogate Harrison upon arresting him. Second, even if the AUSA violated ethical rules, case law does not make clear whether exclusion of evidence is an appropriate sanction. Compare *United States v. Powe*, 9 F.3d 68, 69 (9th Cir. 1993) ("Although a prosecutor has a duty under the Rule not to communicate with an indicted defendant known to be represented by counsel, and a court is empowered to exclude evidence obtained in violation of the Rule, we have held the duty to avoid ex parte contacts does not apply to preindictment, noncustodial conversations with a suspect.") (footnotes and citation omitted) with *United States v. Heinz*, 983 F.2d 609, 613-14 (5th Cir. 1993) ("Even if we could join in with the dissent's conclusion that the canons of ethics applied in this case, we could find no basis to suppress the evidence. The purpose of suppressing evidence is, primarily, to deter police and other government misconduct. In this case, there has been no wilful misconduct by law enforcement officials.") (citation omitted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[**28]

C. Did the eventual indictment bring charges anticipated by the scope of the government's pre-indictment investigation?

We now address the relationship between the scope of the government's investigation and the charges brought in the indictment. If there is a close nexus between investigation and indictment, then the government should expect that the lawyer assisting a defendant during the investigation will continue to provide legal advice once formal adversary proceedings commence. That ongoing relationship may be transformed into invocation of the right to counsel following indictment.

In Harrison's case, the grand jury investigation targeted both the activities of the drug ring and Estes's murder. The government eventually indicted Harrison on both drug and murder charges. The "fit" between the investigative focus and the prosecutorial target is precise.

*D. Conclusion*

Harrison established an ongoing relationship with counsel during the government's pre-indictment investigation. The government knew of Harrison's ongoing representation by counsel. Moreover, the connection between the scope of the government's investigation and the eventual charges was close. [**29] As a result, Harrison's ongoing representation by Traun invoked his Sixth Amendment right to counsel following its attachment at the time of indictment.

[*1216] Accordingly, we hold that Harrison's Florida statements were procured in violation of his Sixth Amendment right to counsel. The statements must be suppressed under *Jackson*.

AFFIRMED.

Document 1 of 1.

Terms and Conditions | Privacy

Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All Rights Reserved.