REQUESTED BY:  ROSENBLATT, ERIK B
O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N | PAGE    1 |
| | CASE NUMBER ████████ |

TITLE: NATASHA SINGH ET AL.

CASE STATUS:     INTERIM RPT

| REPORT DATE 051106 | DATE ASSIGNED ████ | PROGRAM CODE ████ | REPORT NO. ██ |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
MEMO OF INTERVIEW

TOPIC: INTERVIEW OF NATHANIEL ALEXANDER ON MARCH 29, 2006

SYNOPSIS:

On March 29, 2006, SA Erik Rosenblatt, SA Ruben Correa and AUSA Danya Perry met with Nathaniel ALEXANDER at the office of the United States Attorney for the Southern District of New York.  Representing ALEXANDER at this meeting was Michael Fineman, Esq.

The sum and substance of this interview is contained herein.

| DISTRIBUTION: SACNY | SIGNATURE: ROSENBLATT     ERIK     B   SENIOR SPEC AGENT |
|---|---|
| | APPROVED: HEYDWEILLER     LAURA     A   OI GRP SUPERVISOR |
| | ORIGIN OFFICE: NY NEW YORK, NY - SAC |  TELEPHONE: ████████ |

O F F I C I A L   U S E   O N L Y                    TYPIST: ROSENBLATT

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

EXHIBIT
A

O F F I C I A L   U S E   O N L Y



| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE   2 |
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER ▮▮▮▮▮▮ |
| | REPORT NUMBER: ▮ |

CASE PROGRAM CODES:

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY
OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR
ISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED
TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    3 |
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER ▓▓▓▓▓▓▓ |
| | REPORT NUMBER: ▓▓▓▓ |

On March 29, 2006, SA Erik Rosenblatt, SA Ruben Correa and AUSA Danya Perry met with Nathaniel ALEXANDER at the office of the United States Attorney for the Southern District of New York. Representing ALEXANDER at this meeting was Michael Fineman, Esq.

AUSA Perry explained the contents of a written agreement between the US Attorney's Office and ALEXANDER, advising that his statements could be used against him. Each of the individuals present for this meeting signed the document dated March 29, 2006.

The following is the sum and substance of ALEXANDER's statements:

ALEXANDER joined B&T Petroleum Recovery ("B&T"), after Theron Atlas Bumpers, Jr. and James Thoragood-the original partners- recruited him. Both reside in Norfolk, Virginia.

Previously, ALEXANDER and Bumpers were partners in a business named Mr. A's. According to ALEXANDER, the business had 170 employees and functioned as a cleaning and food service company for military shipyards. Mr. A's grossed $250,000 per year. It was operational for twelve years and closed prior to the creation of B&T.

B&T provided fuel tank cleaning services to military carriers docked in Norfolk, VA. According to ALEXANDER, B&T (and Mr. A's) was part of the U.S. Small Business Administration's 8-A (section 8-A, Small Business Act) A business development program created to help small disadvantaged businesses . B&T used ADT payroll services.

B&T was profitable until the Iraqi war, when most of the ships were deployed. After the ships later returned to port, bigger companies took the business away from the areas smaller companies such as B&T. Four years ago, both Bumpers and Thoragood left the business and all twenty employees were let go. ALEXANDER was left responsible for a $100,000 line of credit held by B&T at Resource Bank.

ALEXANDER estimates that he made a yearly salary of approximately $80,000 while at B&T.

AUSA Perry explained that his statements about other individuals couldn't be used directly against other individuals, although they could be used against him

ALEXANDER's current venture is the Vision Learning Center. It was started six years ago and has 15 employees and 75 children attending. He says he earns $65,000 per year and says it's his sole source of income. ALEXANDER said this

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE    4 |
|---|---|
| | CASE NUMBER: ████████ |
| | REPORT NUMBER: ████ |

venture is paying off the debt incurred by B&T.

ALEXANDER is also working with "Mr. Simon", who owns a company named T2KW (Tires to Kilowatts). T2KW converts tire rubber to a fuel source. ALEXANDER says he was hired to collect rubber tires. ALEXANDER has not yet done any work for this venture.

ALEXANDER is also involved with Dr. Jerome Kennedy. Dr. Kennedy designed a medical device, and alleges that a foreign company stole its design. The case is in litigation, according to ALEXANDER. When the matter is settled, Dr. Kennedy would like to distribute his product from the former site of B&T at 3334 Tait Terrace, Norfolk, VA. Kennedy reportedly also has a distribution center in Hampton, VA.

ALEXANDER says he also works with Baynon Sports, a sports surface company, owned by John Baynon (telephone 410 935-4058). ALEXANDER is currently negotiating two contracts (City of Hampton, VA and the University of Pittsburgh), and Riddick is in contact with a site in St. Kitts and three in the Bahamas. The tracks in the Bahamas are scheduled to be built during the second week of April. The value of each of these Bahamian contracts is: $5 million, $2 million and $2 million.

ALEXANDER and Riddick agreed that they would split a 10% commission with every sale by either of them; they would be paid at the start of the project. ALEXANDER says that he doesn't have any formal agreement or contract with either Baynon Sports or Riddick. ALEXANDER met Baynon through Riddick, and hasn't spoken with Baynon in three months.

ALEXANDER met Riddick during the 1970's when they both ran track. They reacquainted during the 1980's when RIDDICK was coaching at Norfolk State University and ALEXANDER was on the campus. Soon after, ALEXANDER gave $100 cash gifts here and there to foreign athletes who weren't getting financial support from their respective countries.

Four years ago, ALEXANDER provided Riddick with office space at the Tait Terrace address when Mr. Bumpers left. Riddick has never paid rent for the space. The only occupants of the address are ALEXANDER, Riddick and Hockaday; however, since their arrests, ALEXANDER asked that Riddick not use the office. ALEXANDER believes that it is possible that Hockaday may be handling Riddick's books.

According to ALEXANDER, Riddick called ALEXANDER prior to April 2005, and inquired whether he was interested in selling his business (B&T) and about the asking price for the business and its assets, because he had someone interested in the company. Riddick said that he had "business people" who are

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE   5 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N  C O N T I N U A T I O N | CASE NUMBER ▓ |
| | REPORT NUMBER: |

paying to train ten athletes, and are also interested in purchasing B&T. Riddick received a check from them for over $300,000. ALEXANDER said the cost of the business would include the warehouse, equipment, pumps, and hoses (stored at an off-site facility). The building, willed to ALEXANDER by his mother, has a $100,000 lien. A friend named Edward Johnson, who previously sold janitorial supplies to Mr. A's, owns the lien. Johnson took the lien because he was confident the building would be sold.

ALEXANDER assumed that this unknown source buying his company was competing for a contract offered annually by Northshipco. ~~ALEXANDER said this would~~ ~~work in the office for three months~~, and the sale would include the building and all equipment. ALEXANDER said that he and Riddick didn't discuss any commission for the sale.

A couple of days later, Riddick called ALEXANDER to say that a check was waiting for him. He picked up the check and brought it to Abe Kalfus, a personal injury lawyer, because of the ~~large dollar amount~~ and because there would be paperwork involved. Kalfus told him not to give up any of his assets until he had a singed contract.

ALEXANDER believes the unknown person purchasing B&T may have been named ~~Pete~~. ~~ALEXANDER said~~ ~~he~~ ~~ask~~ RIDDICK how he knows "Pete". Riddick said the buyers were the real deal and they have a lot of money. ALEXANDER didn't think it was weird that his company was being purchased sight unseen. He wasn't going to turn over any equipment to "Pete" until the check cleared.

On the same day ALEXANDER brought the check to SunTrust Bank, and presented it ~~to~~ the branch manager, Joanne Burbage. Her eyes got big and, at his request, Burbage contacted the issuing bank to see if the funds were available. Burbage told him the funds were available and concurred with ALEXANDER that he should open a new account to deposit this check so it wouldn't be commingled with the funds in his existing account. ALEXANDER wasn't sure of the balance of this existing account.

ALEXANDER was concerned that the check wouldn't clear and that the real estate involved would be jeopardized.

Riddick explained that there would be broker's fees, and so at Riddick's request, ALEXANDER provided him with signed checks with the payee left blank because he had opened a new account to deposit the $850,000 check. ALEXANDER used starter checks. He wrote "B&T" on the top of the starter check and signed them, leaving the payee blank. ALEXANDER said that a check that went to Ephraim (Richardson) looked strange, and that the signature and payee "looked crazy."

O F F I C I A L   U S E   O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE    6 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | CASE NUMBER ▓▓▓▓▓<br>REPORT NUMBER: ▓▓▓ |

AUSA Perry referred to excerpts of ALEXANDER's post-arrest statements

When arrested, ALEXANDER told agents he got a $375,000 check. He said he gave the interviewing agents the wrong amount and forgot to tell the agents about the sale of the property because he was "blown away" when arrested. He said it took a while to piece things together, and that's why he remembers the amount now; what he told agents doesn't make any sense.

ALEXANDER called Mr. Surbage a few days later and learned that the check hadn't yet cleared.

ALEXANDER believed that if he turned over the B&T equipment before the check cleared, he was worried that the check would have later been returned-like the one Riddick received-and he would have lost the equipment he may have turned over.

ALEXANDER wasn't concerned about the source of the check.

ALEXANDER also said that this entire deal doesn't make sense and that opening an account for the sole purpose of depositing the check was unusual.

ALEXANDER made the following statements about the check:

* He thought that the check was from a group of investors.
* He thought that the American Express Travel Service check was where the investment group had their account.
* He couldn't read the signature, but figured it was a member of the investment group.

ALEXANDER deposited a $150,000 check, made payable ALEXANDER, in his BB&T personal account a few weeks after the deposit of the $450,000 check. ALEXANDER said the check was for the purchase of equipment and towards his salary. The check later came back returned.

Looking back, ALEXANDER sees how strange everything is. He now believes he should have got a certified check.

ALEXANDER knew prior to its deposit that checks were going to be written off the account.

He believed that Riddick made an error, but still thinks he'll receive commissions from Riddick's work with Baynon Sports.

ALEXANDER is asking $600,000 for 3334 Tait Terrace.

ALEXANDER knew that by not doing due-diligence, it was a tip-off. And that he

O F F I C I A L   U S E   O N L Y

'IS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY ₄ THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE     7 |
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER |
| | REPORT NUMBER: |

never quoted Riddick a figure for the sale of B&T prior to the check.

ALEXANDER hasn't had any direct telephone contact with Riddick other than a few occasions when he answered the phone at Tait Terrace when Riddick called for Hockaday.

ALEXANDER's cellular phone number is (757) 635-1770.

On March 29, 2006, Mr. Fineman sent both SA Rosenblatt and AUSA Danya Perry, at their respective offices, a facsimile containing the BB&T bank statement dated May 24, 2005, for account number 5135672744.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.